UNITED STATES OF AMERICA

v.                                                                    Case No.: 8:17-cr-4-T-23JSS

JARVIS CHRISTOPHER EVERETT

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant Jarvis Everett's Motion to Suppress Physical Evidence Based Upon an Illegal Search and Seizure ("Motion") (Dkt. 20), the Government's response in opposition (Dkt. 25), and Defendant's reply (Dkt. 30).  On April 5, 2017, the Court held an evidentiary hearing on the Motion.  Upon consideration of the Motion, the argument of counsel, and the evidence, the Court recommends that the Motion be denied for the reasons that follow.

## BACKGROUND

On January 4, 2017, a grand jury indicted Defendant for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1).  (Dkt. 1.)  Defendant was arrested on January 6, 2017, and released on bond pending trial.  (Dkts. 10, 13, 16, 38.)  On February 17, 2017, Defendant filed the Motion, seeking to suppress any and all evidence seized during a search of a vehicle driven by Defendant on September 19, 2016, including a Ruger 9-milimeter firearm.  (Dkt. 20.)[1]

## FINDINGS OF FACT

Hillsborough County Sheriff's Office Deputy Craig Roberts testified that his law enforcement unit investigated Defendant after he became a "target" of law enforcement because he was seen in areas with high criminal activity.  The investigation commenced September 12,

---

[1] The Motion was referred to the undersigned for a report and recommendation.  (Dkt. 21.)

2016. Deputy Roberts testified that on September 14, 2016, he checked whether Defendant's driver's license was suspended, and learned that it had been suspended on August 29, 2016. (Gov't Ex. 1.)

On the morning of September 19, 2016, Deputy Roberts was parked in an unmarked vehicle in the parking lot of the Ascott Place Apartments on Halstead Court in Tampa, Florida (See Gov't Ex. 3), where Defendant's fiancée lived. Deputy Roberts was surveilling Defendant. Deputy Roberts testified that he became familiar with Defendant's appearance by reviewing his driver's license photograph and photograph from his prior arrest. On the morning of September 19, 2016, Deputy Roberts confirmed that Defendant's driver's license was still suspended. At approximately 10 a.m., Deputy Roberts saw Defendant leave an apartment, enter a red minivan, and drive away. At that point, Deputy Roberts alerted the other members of his unit concerning Defendant's movement and location.

Hillsborough County Sheriff's Office Deputy Alan Grinaldi testified that he became involved in the operation on the morning of September 19, 2016, and that his assignment was to conduct a traffic stop of Defendant if the opportunity arose. On the morning of September 19, 2016, Deputy Grinaldi learned that Defendant's driver's license was suspended, reviewed Defendant's Driver and Vehicle Information Database ("DAVID") report, and familiarized himself with Defendant's appearance from the DAVID report, which showed Defendant's driver's license photograph. (See Gov't Ex. 1.) Deputy Grinaldi testified that he had knowledge of Defendant prior to September 19, 2016, having heard his name and read it in reports of past criminal incidences, but had never met him.

On the morning of September 19, 2016, Deputy Grinaldi was parked in an unmarked car in the parking lot of a Wendy's restaurant located on Bruce B. Downs Boulevard, not far from

Ascott Place Apartments.  (See Gov't Ex. 3.)  Deputy Grinaldi was in contact with his unit, and learned from Deputy Roberts that Defendant left Ascott Place Apartments in a maroon minivan, heading south on Bruce B. Downs Boulevard.  As Defendant approached 138th Avenue (See Gov't Exs. 3, 6), Deputy Grinaldi was alerted that Defendant was coming close to him, so Deputy Grinaldi began driving his vehicle to remain inconspicuous.  While driving, Deputy Grinaldi and Defendant drove past one another, and Deputy Grinaldi identified Defendant as the driver.  Deputy Grinaldi parked his car in a different area to remain concealed.

At that point, Deputy Grinaldi testified that he was instructed to initiate a stop of Defendant's vehicle and thus began to follow the minivan.  Once Defendant reached Ascott Place Apartments, Deputy Grinaldi initiated a traffic stop.  Deputy Grinaldi testified that he initiated the traffic stop because Defendant was driving with a suspended license, which was a felony for Defendant because of Defendant's record of license suspensions.

After stopping Defendant's vehicle, Deputy Grinaldi testified that he asked Defendant for his driver's license, and Defendant gave it to him.  He testified that he ran Defendant's license number and confirmed that his license was suspended.  On cross examination, when asked whether Defendant in fact told Deputy Grinaldi that he did not have his driver's license, Deputy Grinaldi testified that he could not recall.  Thereafter, Deputy Grinaldi called for a marked car to assist him, as well as for a canine unit.  He called the canine unit to have a search performed.  Deputy Grinaldi testified that other than Defendant's driving with a suspended license, nothing else gave Deputy Grinaldi cause for suspicion.

The marked patrol car arrived about ten minutes later, and Deputy Grinaldi briefed the officer about the operation.  Then, Deputy Grinaldi asked Defendant to exit the minivan, arrested Defendant, handcuffed Defendant, and put Defendant in the back of the marked patrol car.  Deputy

Grinaldi testified that, upon taking Defendant into custody, an officer performed a pat-down search of Defendant but found nothing.

The canine unit, led by Hillsborough County Sheriff's Office Deputy Chris Grecco, arrived approximately twenty minutes after being called, Deputy Grinaldi testified. Deputy Grecco testified that it took him approximately ten to fifteen minutes to arrive at the scene of the traffic stop. Deputy Grecco testified that, upon arriving, Deputy Grinaldi informed him about the operation and asked Deputy Grecco to lead his canine, Bullit, in a sniff search of the minivan's exterior.

While Defendant was in custody in the back of the marked patrol car, Deputy Grecco led Bullit in a sniff search. At the minivan's passenger door, Bullit alerted to the scent of narcotics. Deputy Grinaldi testified that before this alert, other than Defendant's driving with a suspended license, a traffic violation, he had no suspicion of Defendant's criminal activity. At Bullit's alert, Deputy Grecco opened the passenger door, and Bullit performed a sniff search of the minivan's interior, where Bullit again alerted to the scent of narcotics. At that point, Deputy Grecco and Deputy Grinaldi searched the minivan's interior for narcotics. Deputy Grecco testified that he saw and smelled traces of marijuana but did not collect them or test them because he collects illegal substances only if law enforcement intends to charge a defendant for possessing them. In a storage compartment in the floorboard behind the passenger seat, Deputy Grecco found a firearm. (See Gov't Exs. 8, 9.) Deputy Grinaldi testified that he assisted in the search and that the storage compartment had to be opened to reveal the firearm.

Deputy Grinaldi testified that he searched the minivan's license plate to determine its owner and learned that it was owned by a car dealership, Wheels City. He learned that Defendant's fiancée's mother, Tiffany Jackson, received the minivan as a loaner vehicle while Wheels City

serviced her vehicle.  Specifically, on September 8, 2016, Ms. Jackson signed a Vehicle Rental Agreement for her use of the minivan.  (Gov't Ex. 7.)  According to the rental agreement, Ms. Jackson was permitted to use the minivan, but she agreed to not allow any other person drive the minivan.  (Gov't Ex. 7.)

Ms. Jackson testified, however, that she gave Defendant permission to drive the minivan. Specifically, she testified that the minivan broke down while she was driving the vehicle.  She and Defendant drove the minivan to Wheels City for it to be inspected.  Someone from Wheels City inspected the minivan and told her that it could be driven.  Ms. Jackson explained, however, that to have a reliable car to use for her job, Defendant allowed her to drive his car, and, in exchange, she gave Defendant permission to drive the minivan.  Ms. Jackson testified that after Wheels City inspected the minivan, she drove Defendant's car while Defendant drove the minivan out of the Wheels City parking lot without any objection from the individual at Wheels City who inspected the minivan.  Ms. Jackson testified that Defendant had her permission to drive the minivan on September 19, 2016, but that she was not aware that his license was suspended at that time.  She testified that she would not have permitted Defendant to drive the minivan if she had known his license was suspended.

After Deputy Grinaldi determined that Wheels City owned the minivan and that Ms. Jackson was loaned the minivan, Defendant provided Deputy Grinaldi with Ms. Jackson's telephone number.  Deputy Grinaldi testified that he attempted to contact Ms. Jackson, but she did not answer his call.  Ms. Jackson, however, testified that she never received a call from law enforcement and that she would not have given her consent to law enforcement to search the minivan.  Deputy Grinaldi contacted Wheels City about releasing the minivan, and a Wheels City representative retrieved the minivan.  Deputy Grinaldi testified that he informed the representative

that the minivan had been searched and offered to perform an additional search before releasing the minivan. He testified that, as a practice, he does not always search vehicles before releasing them to their owners after a traffic stop, but he will search them to ensure that no weapons or illegal materials are in the vehicle.

## APPLICABLE STANDARDS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. "Evidence obtained in violation of the Fourth Amendment must be suppressed," *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011), and "cannot be used in a criminal trial against the victim of the illegal search and seizure," *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

## CONCLUSIONS OF LAW

### A.      Expectation of Privacy

As a threshold issue, the Government contends the Motion should be denied because Defendant lacks standing to contest the search of the minivan. (Dkt. 25 at 6.) Recognizing that there is no binding precedent, the Government argues that courts in the Eleventh Circuit have held that unauthorized drivers of rental cars who do not have valid driver's licenses lack standing to challenge a search of the rental car they drive. (Dkt. 25 at 6.)

"In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (internal quotations omitted). Thus, in order for the Fourth Amendment to apply, a person must have a "reasonable expectation of privacy

under the circumstances." *United States v. Siau*, 281 F. App'x 949, 950 (11th Cir. 2008) (internal quotations omitted).

Thus, in challenging the search of the minivan on Fourth Amendment grounds, Defendant "must establish both a subjective and an objective expectation of privacy," with the subjective component requiring "that a person exhibit an actual expectation of privacy," and the objective component requiring "that the privacy expectation be one that society is prepared to recognize as reasonable." *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (internal quotations omitted); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997) ("To have standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area searched."). In assessing the reasonableness of a privacy expectation, courts consider the following factors: whether defendant owned, had a possessory interest in, and/or had the right to exclude others from the place searched, exhibited a subjective expectation that it would remain free from governmental invasion, took normal precautions to maintain privacy, and was legitimately in the place searched. *United States v. Haydel*, 649 F.2d 1152, 1154–55 (5th Cir. 1981).

The Eleventh Circuit has not yet considered "whether an unlicensed and unauthorized driver of a rental car has standing to challenge the search of the rented vehicle," and "[t]he circuits that have considered the issue are split." *United States v. Gayle*, 608 F. App'x 783, 788–89 (11th Cir. 2015) (declining to decide the standing question because defendant could not prevail on his challenge of the search of the vehicle). The Eleventh Circuit summarized the split among circuit courts as follows:

> The Fourth, Fifth, and Tenth Circuits have held that unauthorized drivers of rental vehicles never have standing to challenge a vehicle search. *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990); *United States v. Obregon*, 748 F.2d 1371, 1374–75 (10th Cir. 1984). On the other hand, the Eighth and Ninth Circuits have held that an unauthorized driver may challenge the search of a rental vehicle if he can establish

that he had permission from the authorized driver to use the vehicle. *United States v. Thomas*, 447 F.3d 1191, 1198–99 (9th Cir. 2006); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). The Third and Sixth Circuits have determined that an unauthorized driver does not have standing to challenge the search, but has noted the possibility that exceptional circumstances might create the legitimate expectation of privacy. *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011); *United States v. Smith*, 263 F.3d 571, 586–87 (6th Cir. 2001).

*Id.*; *compare United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990) (reasoning that defendant had no legitimate expectation of privacy in a rental car he drove that was rented by his girlfriend when the rental agreement gave only his girlfriend authority to drive the car and his girlfriend "had no authority to give control of the car" to defendant), *and United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (same), *and United States v. Obregon*, 748 F.2d 1371, 1375 (10th Cir. 1984) (same), *and United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011) (concurring with "the majority of circuits" and concluding that "as a general rule, the driver of a rental car who has been [l]ent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy"), *and United States v. Smith*, 263 F.3d 571, 586–87 (6th Cir. 2001) (acknowledging that "as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle," but rejecting the "bright line test" of whether the driver is listed on the rental agreement, reasoning that defendant's situation was "truly unique" because he was a validly-licensed driver, made and paid for the reservation, although his wife picked up the car and signed the rental agreement, and had his wife's permission to drive the vehicle), *with United States v. Thomas*, 447 F.3d 1191, 1198–99 (9th Cir. 2006) (holding that "[a]n unauthorized driver may have standing to challenge a search if he or she has received permission to use the car," reasoning that the driver's possession of the vehicle, right to exclude others from the vehicle, and having the owner's permission to drive the vehicle were sufficient grounds for

standing), *and United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (remanding for a factual determination regarding standing, reasoning that if the person who rented the vehicle "had granted [defendant] permission to use the automobile, [defendant] would have a privacy interest giving rise to standing").

Although the Eleventh Circuit has not decided whether an unauthorized driver of a vehicle who does not have a valid driver's license has standing to contest a search, it has evaluated standing in situations sharing some factual similarities. First, in *Miller*, the Eleventh Circuit held that the driver of car borrowed from his friend—that his friend owned, rather than rented—had a reasonable expectation of privacy in the vehicle and therefore had standing to challenge law enforcement's search of the vehicle incident to a traffic stop. *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987). In so holding, the Eleventh Circuit found the defendant's factual scenario more analogous to an individual who was in an apartment with the owner's permission, who had standing to contest a search, than to passengers in a car they did not own, who did not have standing to contest a search. *Id.* (comparing *Jones v. United States*, 362 U.S. 257 (1960) with *Rakas v. Illinois*, 439 U.S. 128 (1978)). Citing the Tenth Circuit's *Obregon* decision, in which the Tenth Circuit upheld the trial court's determination that a driver of a rented car, of which the driver was not the lessee, with expired license plates lacked standing to contest a search of the rental, the Eleventh Circuit reasoned as follows:

> Our holding is not disturbed by the approach taken by the Tenth Circuit in *United States v. Obregon*, 748 F.2d 1371 (10th Cir. 1984), as advanced by the government in this case. The court in *Obregon* rejected an assertion of standing by the driver of a car that had an expired license plate and that was rented by a third party who was not in the car. Without deciding whether, in this circuit, the *Obregon* defendant would have had standing, we think that the appellant in this case had a far clearer expectation of privacy in the borrowed car than does a driver in Obregon's situation. We also note that the initial stop in *Obregon* was legitimate, unlike in this case; in *Obregon,* the stop was made pursuant to a routine roadblock checking licenses and registrations.

*Id.*

Next, in *Cooper*, the Eleventh Circuit held that the lessee of an overdue rental car had standing to contest a search of the car. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). In that case, the Eleventh Circuit reasoned that the driver had an expectation of privacy in the rented vehicle because the rental contract had expired only four days before the search, the driver was in possession of the car at the time of the search, the driver had paid the rental company in full, and the rental company had not taken steps to repossess the car upon the contract's expiration. *Id.* at 1400. The Eleventh Circuit distinguished the Fourth Circuit's *Wellons* decision, 32 F.3d 117, in which the Fourth Circuit held that an unauthorized driver of a rental car, who had permission to drive it from the authorized driver, had no legitimate privacy interest in the rental, reasoning that unlike the defendant in *Wellons*, defendant was the listed lessee under the rental contract and thus was "in privity of contract (albeit in breach) [with the rental company] at the time of the search." *Id.*

Courts in the Eleventh Circuit have examined whether unauthorized drivers of rental cars have standing to contest a search of a rental vehicle. First, in *Murray*, the Southern District of Georgia analyzed whether a defendant had standing to challenge a search of a rental car he drove with the permission of the lessee. *United States v. Murray*, No. CR410-266, 2011 WL 1806971, at *2 (S.D. Ga. May 11, 2011). The court in *Murray* adopted the "totality of the circumstances approach" used by the Sixth Circuit in *Smith*, 263 F.3d 571. *Id.* at *2–3. Specifically, the *Murray* court considered whether:

> (1) the defendant could legally operate the vehicle and the status of his license; (2) the defendant was able to present the rental agreement and provide sufficient information about the vehicle; (3) the defendant was related to the renter or otherwise had an "intimate relationship;" (4) the defendant had permission of the authorized driver to use the rental car; and (5) the defendant had a business relationship with the rental car company and the nature thereof.

*Id.* at *2.  The court concluded that Defendant had standing to contest the search because Defendant produced a valid driver's license and a copy of the rental agreement upon request, and the name of the lessee on the rental agreement matched the name of defendant's friend who defendant said allowed him to borrow the rental.  Next, the defendant's friend gave defendant permission to drive the rental at the time of the stop, and defendant had possession of the rental for more than a week prior to the stop.  Finally, although the court had no evidence of defendant's relationship with the rental car company, the court concluded that the "totality of the circumstances" supported defendant's reasonable expectation of privacy in the rental.  *Id.* at *3.

Next, in *Alexis*, the Southern District of Florida examined whether the driver of rental car who was not an authorized driver under the rental agreement and was driving with a suspended license had standing to contest a search the rental.  *United States v. Alexis*, 169 F. Supp. 3d 1303, 1305–06 (S.D. Fla. 2016).  The defendant was not the lessee of the rental car.  *Id.* at 1306.  The defendant's girlfriend's mother, Ms. Andrews, testified that she rented the car from Hertz while her car was being repaired.  *Id.*  She testified that she regularly allowed the defendant to borrow the rental, and that he borrowed it the day of the search.  *Id.* at 1306–07.  Ms. Andrews also testified that the defendant was not listed as an authorized driver under the rental agreement.  *Id.* at 1306.

The Southern District of Florida found that the defendant was not authorized by Hertz to drive the rental car, was driving with a suspended license, and that Ms. Andrews, the lessee, gave the defendant permission to drive the rental.  *Id.* at 1312.  The court rejected the reasoning of the Eighth and Ninth Circuits, who have held that "an unauthorized driver may challenge the search of a rental vehicle if he can establish that he had permission from the authorized driver to use the vehicle."  *Id.* at 1311, 1312–13.  The court reasoned that an unauthorized driver of a rental is not analogous to an authorized driver a rental who retains after the rental period expires because the

risk to the owner differs: owners may require authorized drivers to provide information such as whether they have valid driver's licenses and may not "agree to rent the car to an individual who did not provide this valuable information relevant to determine the driver's risk to the owner." *Id.* at 1313. Thus, "when a renter overstays the lease of a rental, there are oftentimes built in billing mechanisms, such as tardiness and penalty fees, to easily compensate the owner." *Id.*

The Southern District of Florida concluded that the defendant did not have a reasonable expectation of privacy in the rental, and thus had no standing to contest its search. *Id.* at 1314. In so holding, the court reasoned that the defendant (1) had no relationship with Hertz, (2) never provided Hertz any information, (3) never sought Hertz's authorization to use the rental, and (4) "likely believed that Hertz would not have permitted him to drive the Impala, due to his suspended license." *Id.* at 1313. Thus, the court found the defendant's situation more akin to that of the driver of a stolen vehicle than to a renter of an expired rental. *Id.* at 1314.

Like *Alexis*, the Middle District of Florida also considered whether the driver of rental car who was not an authorized driver under the rental agreement and was driving with a suspended license had standing to contest a search the rental. *United States v. Crisp*, 542 F. Supp. 2d 1267, 1270 (M.D. Fla. 2008), *aff'd*, 355 F. App'x 378 (11th Cir. 2009) (declining to address the issue of standing on appeal because the issue was not preserved). There, the defendant's driver's license had been revoked for five years. He drove a van rented by his girlfriend, who had given him permission to drive the van despite her knowledge that the defendant did not have a valid driver's license. The defendant was not an authorized driver of the van. *Id.* at 1270–71.

In analyzing the reasonableness of the defendant's expectation of privacy in the van, the court's analysis hinged on defendant being an unlicensed and unauthorized driver of the rental. *Id.* at 1276. The court held that the defendant's not possessing a valid driver's license "decidedly tips

the scales in favor of the conclusion that Defendant in the case at bar did not have a reasonable expectation of privacy in the vehicle and cannot challenge the search at issue." *Id.* at 1279. In reaching this conclusion, the court explained that both the defendant and the lessee of the van testified that they knew defendant was not permitted to drive the van because of his suspended license and reasoned that the defendant "was not permitted to operate any vehicle" and that his "operation of any vehicle constituted a felony." *Id.* at 1280–81 (citing *United States v. Haywood*, 324 F.3d 514, 516 (7th Cir. 2003) (holding that an unauthorized driver a rental who was unlicensed did not have a reasonable expectation of privacy in the rental car because the defendant "should not have been driving any car, much less a rental car that Enterprise never would have given him permission to drive")).

Thus, the court reasoned, the defendant would not have been able to exclude the rental company or his girlfriend from the van, could not have made any arrangements with the rental company to operate the van, and his girlfriend could not "confer the consent of the owner, Enterprise, in defiance of its policy against allowing unlicensed drivers to operate its vehicles," or "circumvent Florida's statutory prohibition against Defendant's operation of any vehicle under any circumstances." *Id.* at 1281–82. Therefore, the court concluded that "society would be loathe to recognize" an expectation of privacy by an individual who unlawfully drove a vehicle. *Id.* at 1282.

Here, Defendant's license was suspended on August 29, 2016 (Gov't Ex. 1), and Defendant was driving the minivan with a suspended license on September 19, 2016. Wheels City owned the minivan Defendant drove and had entered into a rental agreement with Ms. Jackson on September 8, 2016. (Gov't Ex. 7.) Under the rental agreement, Ms. Jackson was the only authorized driver of the minivan. (Gov't Ex. 7.) Ms. Jackson, however, gave Defendant permission to drive the

minivan on multiple occasions, including on September 19, 2016, but Ms. Jackson was not aware that Defendant's license was expired. Ms. Jackson testified that an individual at Wheels City saw Defendant drive the minivan out of the Wheels City parking lot and made no objection.

Based on Defendant's receiving Ms. Jackson's permission to drive the minivan on several occasions, including on September 19, 2016, it appears that Defendant has made a showing of his subjective expectation of privacy in the minivan. "[F]or purposes of this analysis, the Court will assume, without deciding, that Defendant has satisfied this initial threshold." *Crisp*, 542 F. Supp. 2d at 1275. The Court now turns to the issue of whether Defendant's privacy expectation is one that society is prepared to recognize as reasonable.

The reasonableness of Defendant's expectation of privacy "depends upon the totality of circumstances." *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987). Here, considering the totality of the circumstances, the Court concludes that Defendant does not have standing to contest the search of the minivan. First, like the courts in *Murray*, *Alexis*, and *Crisp*, this Court considers that Defendant drove with a suspended license in assessing the reasonableness of his expectation of privacy in the minivan. The Court recognizes that "[a] driver of a car does not lose all Fourth Amendment protections simply because his license is invalid." *United States v. Walton*, 763 F.3d 655, 663 (7th Cir. 2014) (citing *Arizona v. Gant*, 556 U.S. 332 (2009) and reasoning that "[c]ourts do not resolve car search cases in which the driver has a suspended license by omitting the Fourth Amendment analysis and simply concluding the driver lacks standing"). But the Court also recognizes, as reasoned by the *Crisp* court, that "society would be loathe to recognize" an expectation of privacy of an individual in a vehicle he unlawfully drives. *Crisp*, 542 F. Supp. at 1282.

Next, the Court considers the testimony regarding whether Defendant was an authorized driver of the minivan. The Court credits Ms. Jackson's testimony that she gave Defendant permission to drive the minivan but also recognizes that Ms. Jackson, in the rental agreement, agreed to not allow anyone else to drive the minivan (See Gov't Ex. 7). Although Ms. Jackson also testified that an individual from Wheels City watched Defendant drive the minivan out of the parking lot of Wheels City without objection, this testimony serves her family's interest. Considering this interest in conjunction with the fact that Ms. Jackson did not testify concerning the title or authority of the individual at Wheels City she allegedly encountered on the day Defendant drove the vehicle away from Wheels City and the lack of testimony from Wheels City regarding whether Defendant was granted implicit permission to drive the minivan, the Court is unpersuaded by this portion of Ms. Jackson's testimony. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (explaining that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony"); *Nelson v. Shirkey*, No. 2:10-CV-0112-IPJ-PWG, 2012 WL 6043459, at *3 (N.D. Ala. Sept. 24, 2012), *report and recommendation adopted,* No. 4:10-CV-00112-IPJ, 2012 WL 6043296 (N.D. Ala. Nov. 29, 2012) ("[T]he court must weigh the testimony of all the witnesses, taking into account the interests of the witnesses, the consistency or inconsistency of their testimony, and their demeanor on the stand."). Moreover, Ms. Jackson testified that she would not have permitted Defendant to drive the minivan if she knew his license was suspended.

Thus, like the defendants in *Alexis* and *Crisp*, Defendant did not have the owner's authorization to drive minivan. Following the Eleventh Circuit's reasoning in *Cooper*, Defendant's expectation of privacy "was materially different from" the lessee of a rental car whose lease has expired because Cooper, unlike Defendant, was listed as lessee under the rental contract

and thus was "in privity of contract (albeit in breach) [with the rental company] at the time of the search." *Cooper*, 133 F.3d at 1400.

Accordingly, given the totality of the circumstances, the Court concludes that Defendant lacks standing to contest the search of the minivan. Even assuming Defendant has standing to contest the search, for the reasons that follow, the Court concludes that the search of the minivan did not violate the Fourth Amendment.

**B.  Initiating Traffic Stop**

Although not argued in the Motion, in his reply, Defendant contends that Deputy Grinaldi did not have reasonable suspicion to stop Defendant's minivan because no officer confirmed that Defendant's license was still suspended before pulling him over. (Dkt. 30 at 4.) Defendant's contention, however, does not comport with the evidence. Deputy Roberts credibly testified that he learned that Defendant's license was suspended on September 14, 2016, which he confirmed on the morning of September 19, 2016. Likewise, Deputy Grinaldi testified that on the morning of September 19, 2016, he reviewed Defendant's DAVID report, from which he learned that Defendant's license was suspended. Both Deputy Roberts and Deputy Grinaldi testified that they became familiar with Defendant's appearance by reviewing his photographs, and both testified that they saw Defendant driving the minivan on the morning of September 19, 2016. Considering this testimony, the traffic stop was constitutional because it was based on probable cause to believe a traffic law was violated, *see United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008), specifically that Defendant was driving with a suspended license.

**C.  Requesting a Canine Unit**

Deputy Grinaldi testified that after stopping Defendant's vehicle, he confirmed that Defendant's driver's license was still suspended. He then called for a marked car to assist him and

for a canine unit to perform a search. Deputy Grinaldi testified that other than Defendant's driving with a suspended license, there were no other circumstances that gave him cause for suspicion. This testimony raises the question of whether Deputy Grinaldi's requesting a canine unit was proper.

In *Illinois v. Caballes*, the Supreme Court decided "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." 543 U.S. 405, 407 (2005). There, the defendant was pulled over for speeding. *Id.* at 406. When the officer radioed dispatch to report the stop, a second officer overhead the transmission and drove to the stop with his narcotics-detection canine. *Id.* The defendant's car was parked on the shoulder, and the defendant was in the first officer's car. *Id.* While the first officer wrote a warning ticket, the second officer walked the canine around the defendant's car, and the canine alerted at the trunk. *Id.* The officers searched the trunk, finding marijuana. *Id.*

The Supreme Court assumed that the officer had no suspicions about the defendant other than that he had been stopped for speeding. *Id.* The Supreme Court reasoned that because there is no legitimate interest in possessing contraband materials, "governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest." *Id.* at 408 (emphasis in original). The Supreme Court concluded as follows:

> the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.
>
> . . .
>
> A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

*Id.* at 409; *cf. Rodriguez v. United States*, 135 S. Ct. 1609 (2015) (holding that a drug sniff conducted *after* the time necessary to complete the traffic stop violated the Fourth Amendment).

Although the officer in *Caballes* did not request a canine unit (instead, one came to the scene after hearing the radio transmission of the traffic stop), the Eleventh Circuit held that "during the course of a lawful traffic stop, an officer does not need any level of suspicion of criminal activity *either to request a canine unit* or to conduct a canine sniff." *United States v. Holt*, 777 F.3d 1234, 1256–57 (11th Cir. 2015) (emphasis added). Accordingly, Deputy Grinaldi's summoning the canine unit during the course of the traffic stop—despite Deputy Grinaldi's testimony that he had no reason to suspect any criminal activity other than Defendant's driving with a suspended license—was not improper. *See United States v. Steed*, 548 F.3d 961, 975 (11th Cir. 2008) (holding that because the officer was authorized to detain a defendant during a traffic stop to conduct an administrative inspection of a commercial vehicle, the officer's "request for the canine unit during this time period was also lawful").

### D.      Detention After Arrest

Defendant argues, citing *Rodriguez*, 135 S. Ct. 1609, that Deputy Grinaldi impermissibly extended the duration of the traffic stop to conduct the canine sniff search in violation of the Fourth Amendment. (Dkt. 20 at 10–12.) Specifically, Defendant contends that after he was arrested, patted down, and put in the back of the marked patrol car, the officers lacked reasonable suspicion to conduct the canine search of the minivan. (Dkt. 20 at 10.) The evidence shows that after the marked patrol car arrived, Deputy Grinaldi arrested Defendant, an officer performed a pat-down search of Defendant, and Defendant was put in the back of the marked patrol car. Deputy Grecco had not yet arrived at the scene of the traffic stop. The testimony varies on the length of time it took Deputy Grecco to arrive at the scene after Deputy Grinaldi requested a canine unit—Deputy

Grinaldi testified that it took approximately twenty minutes and Deputy Grecco testified that it took approximately ten to fifteen minutes. After Deputy Grinaldi informed Deputy Grecco about the operation, Deputy Grecco led Bullit in a sniff search.

In *Rodriguez*, a canine officer initiated a traffic stop of a car that was driving on the road's shoulder in violation of state law. 135 S. Ct. at 1612. After stopping the car, the officer obtained the driver's license, registration, and insurance information, and ran a records check. *Id.* at 1613. The officer then returned to the car and asked the passenger for his driver's license, which the officer also checked. *Id.* Thereafter, the officer returned to the car to issue a written warning and return the driver's and passenger's documents. *Id.* After returning the documents, the officer asked the driver for his consent to walk the canine around the car, which the driver refused. *Id.* The officer then instructed the driver to turn off and exit the car. *Id.* Upon the arrival of a second officer, the first officer led his canine in a sniff search of the car's exterior. *Id.* The Supreme Court found that the driver's Fourth Amendment rights were violated, holding that law enforcement may not extend a completed traffic stop to conduct a canine sniff search, absent reasonable suspicion. *Id.* at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"); *see Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

In response, the Government argues that *Rodriguez* is inapplicable because, unlike the defendant in *Rodriguez*, Defendant was under arrest at the time of the canine sniff search, rather than subject to a traffic stop. (Dkt. 25 at 11.) The Government argues that because he was arrested,

Defendant "was not free to leave," and "any delay in the arrival of the canine had no effect on the length of [Defendant's] detention." (Dkt. 25 at 11.) In support of this argument, Defendant cites a Sixth Circuit decision, in which the Sixth Circuit concluded that after the valid arrest of a defendant during the course of a traffic stop, there was no "time limit on detention for a dog sniff following [the] lawful arrest." *United States v. Fonville*, 652 F. App'x 383, 387 (6th Cir. 2016). The Sixth Circuit concluded that *Rodriguez* did not apply because, unlike defendant in *Rodriguez*, the defendant was under arrest and "[b]eing under arrest differs in significant constitutional ways from undergoing a simple traffic stop." *Fonville*, 652 F. App'x at 387 (citing *Knowles v. Iowa*, 525 U.S. 113 (1998) (explaining the justifications for searches, and reasoning that a custodial arrest carries greater concerns for officer safety and the need to collect and preserve evidence than a traffic stop)). Specifically, the Sixth Circuit found *Rodriguez* distinguishable because the Supreme Court "focused on the short duration of a traffic stop as opposed to when someone is under arrest." *Id.*

The Court agrees with the Sixth Circuit's reasoning and finds *Rodriguez* inapplicable because Defendant was under arrest. The canine unit arrived approximately ten to twenty minutes after being called to the scene. While the canine unit was en route, Deputy Grinaldi placed Defendant under arrest and in the back of the marked patrol car. Once Defendant was arrested and placed into custody, Defendant was not free to leave. Accordingly, the Court rejects Defendant's contention that his detention was unlawfully extended. *See United States v. Nunez*, No. CR-11-2217-TUC-DCB, 2012 WL 385499, at *3 (D. Ariz. Feb. 7, 2012) ("Because Defendant was lawfully arrested, the time required to obtain the narcotics-detection dog is not at issue."); *United States v. Valandra*, No. CR 11-30010-RAL, 2011 WL 3439930, at *5 (D.S.D. June 9, 2011), *report and recommendation adopted,* No. CR 11-30010-RAL, 2011 WL 3439919 (D.S.D. Aug. 5, 2011)

("Because [defendant] had already been placed under arrest at the time of [the canine's] sniff, the sniff subjected [defendant] to no additional detention or delay that would make the seizure of his person or vehicle constitutionally unreasonable").

### E.    Probable Cause to Search Minivan

The Government contends that the canine's alert to the presence of narcotics supplied law enforcement with probable cause to search the minivan.  (Dkt. 25 at 9–10.)  The Court agrees.[2]

First, it should be noted that the canine's sniffing the exterior of the minivan did not constitute a search of the minivan.  *United States v. Nelson*, 309 F. App'x 373, 375 (11th Cir. 2009) ("Because an individual's privacy interest in a car on a public road is reduced, the use of drug-sniffing dogs on the exterior of a car also is not a search."); *see Caballes*, 543 U.S. at 409 (holding that a canine sniff performed on a car's exterior "does not rise to the level of a constitutionally cognizable infringement").

As to the search of the minivan's interior, when a "drug-trained canine alerts to drugs," there is probable cause to support a warrantless search of the car.  *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993).  This is because "the search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007).  Therefore, when a canine alerts to the presence of narcotics in a car, "the Constitution permits a search of the vehicle immediately, without resort to a warrant."  *Hearn v. Bd. of Pub. Educ.*, 191 F.3d 1329, 1333 (11th Cir. 1999)

---

[2] In the Motion, Defendant contends that the search cannot be justified by the "search incident to arrest" exception to the requirement of a search warrant because Defendant was secured in the back of the marked patrol car at the time of the search.  (Dkt. 20 at 8–10.)  The Court, however, need not address Defendant's argument because, as the Government argues (Dkt. 25 at 9), the officers' search of the minivan was based on probable cause, from the canine's alert, that it contained narcotics.  *See United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983) (explaining that it is the government's burden "to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one").

("[T]he alerting of a drug-sniffing dog to a person's property supplies not only reasonable suspicion, but probable cause to search that property."); *Steed*, 548 F.3d at 975 (explaining that a positive canine alert supplied probable cause to search a trailer pursuant to the "automobile exception to the warrant requirement"). However, "[a] dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.'" *Nelson*, 309 F. App'x at 375 (quoting *Caballes*, 543 U.S. at 409). Reliability is shown through evidence of the canine's training. *United States v. Sentovich*, 677 F.2d 834, 838, n.8 (11th Cir. 1982).

Here, the Government presented evidence of Bullit's training, experience, and certifications (Gov't Ex. 10), and the Court heard Deputy Grecco's testimony regarding how Bullit is trained to alert the scent of narcotics by sitting. Upon consideration of this evidence, the Court concludes that Bullit is a well-trained narcotics canine. Further, the evidence shows that, while sniffing the exterior of the minivan, Bullit alerted to the scent of narcotics at the minivan's passenger door. Upon this alert, Deputy Grecco led Bullit in a sniff search of the minivan's interior, during which Bullit alerted to the scent of narcotics. Deputy Grecco testified that he smelled and saw traces of marijuana in the minivan. The Court concludes that the canine's positive alert to the scent of narcotics while sniffing the exterior of the minivan gave law enforcement probable cause to search the minivan's interior. Therefore, it is recommended that the search of the minivan did not violate the Fourth Amendment.

## F. Inevitable Discovery

Finally, the Government argues that, even in the absence of the canine's alert providing probable cause to search the minivan, the Motion should be denied because the officers would have "inevitably discovered [the gun] during a consent search of the van before it was released to

Wheels City," the owner. (Dkt. 25 at 12.) Specifically, the Government argues that Wheels City would have likely consented to the search of minivan before it was returned. (Dkt. 25 at 13.) Defendant, in contrast, argues that this argument fails as presumptuous. (Dkt. 30 at 6–7.)

Generally, the exclusionary rule dictates that evidence obtained in violation of the Fourth Amendment may not be used in a criminal prosecution against the victim of the illegal search and seizure. *United States v. Stilling*, 346 F. App'x 458, 459 (11th Cir. 2009). Under the inevitable discovery exception, however, the government may introduce evidence that was obtained by an illegal search if the government can establish a "reasonable probability that the evidence in question would have been discovered by lawful means." *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004). The government must also establish that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Id.* To establish active pursuit, the government need not show that police had already planned the particular search that would obtain the evidence. *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015). Rather, the government must establish that the police would have discovered the evidence "by virtue of ordinary investigations of evidence or leads already in their possession." *Id.* (quoting *United States v. Virden*, 488 F.3d 1317, 1323 (11th Cir. 2007) (internal quotations omitted)).

The evidence does not support the Government's argument that the firearm would have been inevitably discovered. Ms. Jackson, the minivan's lessee, testified that she was not contacted by law enforcement for her consent to search the minivan and that she never would have given law enforcement her consent to search the minivan. Further, there was no testimony from a Wheels City representative that Wheels City would have given its consent for the minivan to be searched. Accordingly, this argument fails.

**CONCLUSION**

For the reasons set forth above, the Court recommends that the Motion (Dkt. 20) be denied.

Accordingly, it is

**RECOMMENDED** that the Motion (Dkt. 20) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida on April 19, 2017.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Judge Steven D. Merryday
Counsel of Record

**<u>NOTICE TO PARTIES</u>**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.